FILED IN
COURT OF CRIMINAL APPEALS

June 19, 2015

ABEL ACOSTA, CLERK

PD-0398-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/18/2015 4:49:27 PM
Accepted 6/18/2015 4:57:43 PM
ABEL ACOSTA
CLERK

NO. PD-0398-15

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS
SITTING AT AUSTIN, TEXAS

---

EX PARTE

THOMAS MICHAEL DIXON

---

STATE'S BRIEF ON THE MERITS

---

MATTHEW D. POWELL
Criminal District Attorney
Lubbock County, Texas

WADE JACKSON
K. SUNSHINE STANEK
LAUREN MURPHREE
Assistant Criminal District Attorneys
(Trial attorneys)

BY:   LAUREN MURPHREE
Assistant Criminal District Attorney
Lubbock County, Texas
State Bar No. 24085059
P. O. Box 10536
Lubbock, Texas 79408
Phone: (806) 775-1133
Fax: (806)775-7930
E-mail: LMurphree@lubbockcda.com
(On appeal)
**ATTORNEY FOR THE STATE**

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**

Thomas Michael Dixon

**Appellant's counsel at trial & on appeal:**

Daniel Hurley, Aaron Clements, and Frank Sellers, HURLEY, GUINN & SELLERS, 1805 13th St., Lubbock, TX 79401; phone (806)771-0700; fax (806)763-8199

Selden Hale, 310 SW 6th Ave., Amarillo, TX 79101; phone (806) 372-5711; fax (806)372-1646

**State of Texas:**

At trial:

Matthew Powell, Criminal District Attorney, Wade Jackson, K. Sunshine Stanek, Lauren Murphree, Assistant Criminal District Attorneys, Lubbock County Criminal District Attorney's Office, P.O. Box 10536, Lubbock, Texas 79408; phone (806)775-1100; fax (806)775-7930

On appeal:

Lauren Murphree, Assistant Criminal District Attorney, Lubbock County Criminal District Attorney's Office, P.O. Box 10536, Lubbock, Texas 79408; phone (806)775-1133; fax (806)775-7930

**Trial Court:**

Honorable Jim Bob Darnell, Presiding Judge, 140th District Court of Lubbock County, Lubbock County Courthouse, 904 Broadway, Suite 349, Lubbock, Texas 79401

# TABLE OF CONTENTS

PAGE

IDENTITY OF PARTIES AND COUNSEL………………………………………i

TABLE OF CONTENTS……………………………………………………..ii

INDEX OF AUTHORITIES.................................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ...................................................... 1

ISSUE PRESENTED ........................................................................................... 1

STATEMENT OF FACTS ..................................................................................... 1

SUMMARY OF THE ARGUMENT.......................................................................... 5

ARGUMENT AND AUTHORITIES…………………………………………....6

SOLE ISSUE PRESENTED: Measuring the trial court's ruling against the relevant criteria, did the court of appeals abuse its discretion when it strictly adhered to the standard of review in affirming the trial court's ruling that in light of the scarcity of the record and lack of evidence presented, Appellant failed to meet his burden that he was entitled to a reduction in the amount of bail?................................................................6

I. THE COURT OF APPEALS PROPERLY DENIED APPELLANT'S APPLICATION FOR WRIT OF HABEAS CORPUS BECAUSE APPELLANT FAILED TO SHOW THAT THE BAIL IS EXCESSIVE FOR A PLASTIC SURGEON WITH ACCESS TO ROYALTIES FROM A MULTI-GENERATIONAL OIL AND GAS INTEREST..............................................................7

**A. This Court and the courts of this state have never recognized a "per se unreasonable" amount of bail and the burden of proof remains squarely on Appellant**................................................................................8

**B. The court of appeals properly measured the trial court's ruling against the article 17.15 factors when it concluded that Appellant had not met his burden**................................................................................11

    *i. Bail was strategically set to give a reasonable assurance that Appellant—given his assets—will appear for retrial*................................................12

    *ii. Bail is not being used as an instrument of oppression*................................13

    *iii. The nature and circumstances of the offense were well known to the habeas judge, who presided over Appellant's trial and concluded that a high bail amount is necessary*................................................14

    *iv. Appellant's actual ability to make bail remains unknown*................................17

    *v. The future safety of Richelle Shetina remains paramount*................................19

    *vi. Appellant has no ties to Lubbock County*................................20

**II. THE COURT OF APPEALS GAVE APPROPRIATE CONSIDERATION TO PRECEDENT WHILE RECOGNIZING THAT BAIL CASES ARE GENERALLY FACT SPECIFIC AND SUCCINCT IN THEIR ANALYSES** ................................................................................21

**III. WHILE APPELLANT'S BAIL IS AMONG THE HIGHEST REPORTED IN TEXAS, IT IS NOT OUT OF LINE WITH SIMILAR CASES THROUGHOUT THE UNITED STATES**...25

CONCLUSION AND PRAYER................................................................................27

CERTIFICATE OF SERVICE ................................................................................28

CERTIFICATE OF COMPLIANCE................................................................................28

# INDEX OF AUTHORITIES

**CONSTITUTIONAL PROVISIONS**            **PAGE**

U.S. CONST. amends VIII, XIV ............................................................................... 8

**SUPREME COURT & FEDERAL CASE LAW**

*Stack v. Boyle*,

   342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951) ........................................................ 8

**TEXAS CASELAW**

*Colyer v. State*,

   428 S.W.3d 117 (Tex. Crim. App. 2014) ...................................................... 16

*Cooley v. State*,

   232 S.W.3d 228 (Tex. App.—Houston [1st Dist.] 2014, no pet.) .............................. 11

*Esquivel v. State*,

   922 S.W.2d 601 (Tex. App.—San Antonio 1996, no pet.)................................. 15

*Ex parte Arredondo*,

   No. 04-00-00306-CR, 2000 WL 33128681

   (Tex. App.—San Antonio, Dec. 6, 2000, no pet.)...................................... 18

*Ex parte Baldivia*,

   727 S.W.2d 337 (Tex. App.—Amarillo 1987, no pet.) ..................................... 8

*Ex parte Beard*,

   92 S.W.3d 566 (Tex. App.—Austin 2002, pet. ref'd)......................................21, 23, 24

*Ex parte Benefield*,

   403 S.W.3d 240 (Tex. Crim. App. 2013) ........................................................ 8

*Ex parte Branch*,

   553 S.W.2d 380 (Tex. Crim. App. 1977) ...................................................... 17

*Ex parte Brown*,

    No. 05-00-00655-CR, 2000 WL 964673

(Tex. App.—Dallas, Jul. 13, 2000, no pet.) ........................................................ 10

*Ex parte Brown*,

    959 S.W.3d 369 (Tex. App.—Fort Worth 1998, no pet.) ............................................ 20

*Ex parte Castillo-Lorente*,

    420 S.W.3d 884 (Tex. App.--Houston [14th Dist.] 2014, no pet.) ............................. 12

*Ex parte Chavfull*,s

    945 S.W.2d 183 (Tex. App.—San Antonio 1997, no pet.) ........................................... 11

*Ex parte Dixon*,

    No. 07-14-00433-CR, 2015 WL 1040927 (Tex. App.—Amarillo, Mar. 6, 2015, pet.

    granted) ............................................................................................................. 8

*Ex parte Estrada*,

    398 S.W.3d 723 (Tex. App.—San Antonio 2008, no pet.) ....................................22, 23

*Ex parte Fisher*,

    492 S.W.2d 528 (Tex. Crim. App. 1973) ........................................................... 14

*Ex parte Gandara*,

    No. 08-10-00234, 2011 WL 5995428 (Tex. App.—El Paso Nov. 30, 2011, no pet.). 7

*Ex parte Gonzalez*,

    383 S.W.3d 160 (Tex. App.—San Antonio 2012, pet. ref'd) ..................................7, 22

*Ex parte Harris*,

    733 S.W.2d 712 (Tex. App.—Austin 1987, no pet.) ...................................................... 13

*Ex parte Henson*,

    131 S.W.3d 645 (Tex. App.—Texarkana 2004, no pet.) ............................................. 20

*Ex parte Hunt*,

    138 S.W.3d 503 (Tex. App.—Fort Worth 2004, pet. ref'd) ............................7, 17, 20

*Ex parte Kimes*,

    872 S.W.2d 700 (Tex. Crim. App. 1993) ............................................................ 8

*Ex parte Murray*,

    No. 02-13-00151-CR, 2013 WL 5425312

    (Tex. App.—Fort Worth, Sept. 26, 2013) ...................................................... 21

*Ex parte Pemberton*,

    577 S.W.2d 266 (Tex. Crim. App. 1979) ........................................................ 21

*Ex parte Rubac*,

    611 S.W.2d 848 (Tex. Crim. App. 1981) ............................................7, 8, 9, 14

*Ex parte Scott*,

    122 S.W.3d 866 (Tex. App.—Fort Worth 2003, no pet.) ............................. 12

*Ex parte Tata*,

    358 S.W.3d 392 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ........................................ 18

*Golden Eagle Archery, Inc. v. Jackson*,

    24 S.W.3d 362 (Tex. 2000) .............................................................................. 16

*In re Durst*,

    148 S.W.3d 496 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ....................passim

*Ludwig v. State*,

    812 S.W.2d 323 (Tex. Crim. App. 1991) ............................................8, 19, 23

*Maldonado v. State*,

    999 S.W.2d 91 (Tex. App.--Houston [14th Dist.] 1999, no pet.) ............................... 21

*Mayo v. State*,

    611 S.W.2d 442 (Tex. Crim. App. 1981) ........................................................ 16

*Montgomery v. State*,

    810 S.W.2d 372 (Tex. Crim. App. 1990) .......................................................... 7

*Priel v. State*,

No. 07-09-0349-CR, 2010 WL 445287

(Tex. App.—Amarillo, Feb. 9, 2010, no pet.) ............................................................... 11

**TEXAS STATUTES AND RULES**

Tex. Code Crim. Proc. 17.15 ....................................................... 8, 9, 11, 12, 14

Tex. Const. art. I, §§ 11, 13.............................................................................. 8

Tex. Penal Code § 19.03(b) ........................................................................... 14

Tex. R. App. P. 9.4(i)(1) ............................................................................... 28

Tex. R. App. P. 9.4(i)(3) ............................................................................... 28

**OTHER STATES' CASELAW**

*Abbott v. Colombus*,

289 N.E.2d 589 (Comm. Pl. 1972)................................................................ 10

*In re Scott*,

56 N.W. 1009 (Neb. 1983) .......................................................................... 10

**SECONDARY SOURCES**

Couple Pleads Not Guilty in Halloween Party Shooting at SF Fort Mason, CBS
Local, Nov. 5, 2012, http://sanfrancisco.cbslocal.com/2012/11/05/couple-pleads-not-guilty-in-halloween-party-shooting-at-sf-fort-mason/ .............................27

Shaila Dewan, When Bail is Out of Defendant's Reach, Other Costs Mount, N.Y.
Times, Jun. 10, 2015, http://www.nytimes.com/2015/06/11/us/when-bail-is-out-of-defendants-reach-other-costs-mount.html...............................................................25

Jim Dwyer, A life that frayed as bail reform withered, N.Y. Times, Jun. 9, 2015,
http://www.nytimes.com/2015/06/10/nyregion/after-a-shocking-death-a-renewed-plea-for-bail-reform-in-new-york-state.html..................................................25

Manny Fernandez, 2 Tulsa Shooting Suspects Confess, Police Say, N.Y. Times, Apr.
9, 2012, http://www.nytimes.com/2012/04/10/us/tulsa-murder-suspects-have-

bail-set-at-9-1-million.html.................................................................................27

Lisa Maria Garza, Mass arrests, revenge fears after deadly Texas biker gang shootout, REUTERS, May 11, 2015, http://in.reuters.com/article/2015/05/18/usa-texas-shooting-idINKBN0O317U20150518............................................................................25

Shawn Hill, Judge set bond for alleged prostitute at $1 billion, AP, Jun. 24, 2005, http://archive.wtsp.com/news/article/15280/8/Judge-set-bond-for-alleged-prostitute-at-1-billion..................................................................26

Stephanie Lippert, 100 Million Dollar Bond Set for Accused Memphis Carjacker, EXAMINER.COM, Dec. 14, 2010, http://www.examiner.com/article/100-million-dollar-bond-set-for-accused-memphis-carjacker..........................................................26

Melissa Locker, Watch John Oliver Slam the Unfairness of the U.S. Bail System, TIME, Jun. 8, 2015, http://nymag.com/daily/intelligencer/2015/06/john-oliver-discusses-the-us-bail-system.html.................................................................26

Michael Martinez and Stella Chan, 'Suge' Knight collapses after judge sets bail at $25 million, CNN, Mar. 20, 2015, http://www.cnn.com/2015/03/20/entertainment/suge-knight-hit-and-run-murder-case-bail/...............................................................................26

Michael Shwirtz and Michael Wanerip, Kalief Browder, held at Rikers Island for 3 years without trial, commits suicide, N.Y. TIMES, Jun. 8, 2015, http://www.nytimes.com/2015/06/09/nyregion/kalief-browder-held-at-rikers-island-for-3-years-without-trial-commits-suicide.html?_r=0.....................................25

Oren Yaniv, Bogus cancer doctor charged with sexually molesting his sedated cancer patients, held on $33M bond, DAILY NEWS, Feb. 27, 2011, http://www.nydailynews.com/news/crime/bogus-cancer-doctor-charged-sexually-molesting-sedated-cancer-patients-held-33m-bond-article-1.136742..........................27

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS
SITTING AT AUSTIN, TEXAS

_____

EX PARTE

THOMAS MICHAEL DIXON

_____

STATE'S BRIEF ON THE MERITS

_____

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

The State of Texas, by and through the Lubbock County Criminal District Attorney,

respectfully presents to this Court its brief on the merits in this cause.

## STATEMENT REGARDING ORAL ARGUMENT

The Court has determined that oral argument will not be permitted.

## ISSUE PRESENTED

Measuring the trial court's ruling against the relevant criteria, did the court of appeals abuse its discretion when it strictly adhered to the standard of review in affirming the trial court's ruling that in light of the scarcity of the record and lack of evidence presented, Appellant failed to meet his burden that he was entitled to a reduction in the amount of bail?

## STATEMENT OF FACTS

Thomas Michael Dixon (Appellant) comes from a line of ranchers, farmers, and oil tycoons with roots in the Texas Panhandle.[1] His parents and extended family reside in Spearman, Texas, and his ex-wife and children live in Amarillo.[2] Appellant holds a variety of degrees, but the most recent and relevant is that of medical doctor, which he obtained at the Texas Tech University Health Sciences Center School of Medicine in Lubbock, Texas.[3] After graduating with his medical degree, Appellant completed his residency in Lubbock and a fellowship specializing in plastic surgery in Oklahoma.[4] At the age of forty-one, Appellant opened his practice in Amarillo where he practiced medicine for nine years before he was arrested.[5]

---

[1] (2 RR pp. 18-19).
[2] (2 RR pp. 19-20).
[3] (13 TR pp. 33-34).
[4] (13 TR p. 34).
[5] (13 TR p. 35).

1

Appellant met Richelle Shetina, a Lubbock resident, at the day spa he owned and operated in addition to his medical practice.[6] The two eventually began to date, which sparked a fiery divorce between Appellant and his then-wife.[7] Not long after the divorce, however, Richelle left Appellant for a different doctor: Joseph Sonnier, III, a pathologist in Lubbock, Texas.[8]

After months of surveillance conducted by Appellant and business partner and friend David Neal Shepard, Dr. Sonnier was found dead at his residence on July 10, 2012.[9] The investigation quickly led detectives to Appellant and Shepard, who were both arrested on July 16, 2012, on charges of capital murder, despite Appellant's initial statements to detectives that he did not know who Dr. Sonnier was and "had no clue" who might have killed him, or why.[10] The State's indictment alleged that Appellant hired David Neal Shepard to kill Lubbock pathologist Joseph Sonnier, III.[11] At trial, the State alleged that Appellant paid Shepard three silver bars valued at $9,000 to commit the murder. Text messages and cell tower records proved that Appellant and Shepard were communicating in the minutes just before and after the murder, and that Shepard drove straight to Appellant's house in Amarillo after the murder.

---

[6] (13 TR p. 44).
[7] (13 TR p. 47).
[8] (13 TR p. 63).
[9] (13 TR pp. 105-06).
[10] (2 TR pp. 137-39, 155-56).
[11] After giving a three hour video confession, Shepard pleaded guilty to life without parole. At trial, Shepard testified for the better part of two days claiming that the confession was false and he gave it to avoid the death penalty.

Due to his resources and the gravity of the crime, Appellant's bail was set at $10,000,000. Appellant remained in jail through his trial beginning in October of 2014.[12] After a three-week trial that cost Appellant at least $1.25 million, the jury was deadlocked and the presiding judge declared a mistrial.[13] The next month, Appellant filed an application for writ of habeas corpus in the same trial court asking for a reduction in the amount of bail.[14]

Evidence was deduced at the hearing that a bond for bail of $10 million could "probably" not be obtained in Lubbock County, but that if one were to be made it would require $1 million upfront and $3 million collateral.[15] Appellant's counsel offered to the court that there was one bail bonding company that might consider making the $10 million dollar bond.[16]

Prior to this case, Appellant had never before been arrested. Concerning Appellant's financial resources, his mother testified to the following generalities: Appellant's trial cost upwards of a $1 million and Appellant' "assets" (including a Dodge truck, a Porsche, and stocks in Apple) had been liquidated to fund the trial cost.[17] Dixon stated that the family could afford to post bail if it were reduced to $100,000.[18] The State's argument at the hearing was simple: "the Court can use

---

[12] (13 TR p. 24).
[13] (CR p. 8).
[14] (CR pp. 5-7).
[15] (2 RR pp. 23-24).
[16] (2 RR pp. 9-10).
[17] (2 RR pp. 24-26).
[18] (2 RR pp. 25-26).

common sense . . . . And yet he doesn't have any assets. And yet he pays $1.25 million so far in expenses, but nobody has got any money."[19] The bail bondsman and Appellant's mother were the only two witnesses that testified at the hearing.[20] The trial court denied Appellant's request, and Appellant filed his notice of appeal that day.[21]

On March 6, 2015, the Seventh Court of Appeals issued a memorandum opinion affirming the trial court's ruling, stating in part:

> Given the grave nature of the offense with which he is charged and the potential sentence on conviction, on the record we are presented, we cannot say the habeas judge abused his discretion by finding Dixon failed to carry his burden to show his entitlement to a bail reduction.[22]

After the court of appeals ruling, the trial court set Appellant's retrial for October 12, 2015.

---

[19] (2 RR p. 35).
[20] Appellant entered into evidence a disc of the trial transcripts from the fifteen days of trial testimony along with indictments from capital murders in Lubbock County to illustrate that the next highest bail was set at $1 million. (*See* App. Ex. 2-14).
[21] (CR p. 9).
[22] *Dixon*, at 6.

## SUMMARY OF THE ARGUMENT[23]

This is a case about the standard of review and the amount of deference due to a decision that rests wholly within the discretion of the trial court. This case is less about the details of Appellant's finances, the nature of his case, and the flight risk he poses than it is about his burden to prove those things beyond a preponderance of the evidence at the trial court level. The analysis this Court is tasked with, then, is asking itself whether, as the sole judge of the facts and credibility of the witnesses, the trial court erred when it continued bail in the amount of $10 million after presiding over Appellant's first trial and knowing in full detail the nature of the circumstances of the case. And then, whether the court of appeals abused its discretion when it properly deferred to the trial court's discretion and affirmed its order.

To overcome this high standard, Appellant seeks an unprecedented burden shift based solely on the amount of bail. Appellant argues that because the bail amount is so high, it raises a presumption of abuse and discharges him of his burden. This burden shift is unsupported by Texas law and overlooks the truism that setting bail is a fact-specific inquiry that takes into account a number of factors, one of which being the ability to make bail, which necessarily requires a much larger amount of bail in some cases than in others. Courts faced with bail amounts much higher than Appellant's have engaged in a reasoned and fact-specific inquiry, guided by criteria

---

[23] Because this Court accelerated the timeline for filing of briefs in this case, the State's brief is responsive only to Appellant's petition for discretionary review and arguments in the lower court of appeals, as both the Appellant's and the State's briefs were due in this Court on the same day.

provided by this Court and the Texas legislature, which is precisely what the trial court and court of appeals did when it continued bail in the amount at $10 million.

This court should affirm the court of appeals because it did not abuse its discretion when—after a reasoned analysis of the facts case and relevant criteria—it deferred to the trial court's discretion, fact, and credibility determinations and held that Appellant did not carry his burden of proving he was entitled to a lower bail amount.

## ARGUMENT AND AUTHORITIES

## SOLE ISSUE PRESENTED

Measuring the trial court's ruling against the relevant criteria, did the court of appeals abuse its discretion when it strictly adhered to the standard of review in affirming the trial court's ruling that in light of the scarcity of the record and lack of evidence presented, Appellant failed to meet his burden that he was entitled to a reduction in the amount of bail?

**I. The court of appeals properly denied Appellant's application for writ of habeas corpus because Appellant failed to show that the bail is excessive for a plastic surgeon with access to royalties from a multi-generational oil and gas interest**

A trial court's pretrial bail setting is reviewed for an abuse of discretion.[24] A trial court abuses its discretion when it acts without regard to guiding rule or principles.[25] The abuse of discretion standard requires the reviewing court to measure the trial court's ruling against the relevant criteria by which the ruling was made. But, abuse of discretion is not a de novo review—deference is still given to the trial court's decision, including the weight and credibility assessments of witnesses.[26] That a reviewing court would have made a different decision does not equal an abuse of discretion.[27] As long as the trial court's ruling is within the zone of reasonable disagreement, the decision will be upheld.[28]

While there is no precise standard for reviewing a bail determination, the Constitution and the guidelines set out in the Texas Code of Criminal Procedure art.

---

[24] *Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. 1981).

[25] *Ex parte Gonzalez*, 383 S.W.3d 160, 161 (Tex. App.—San Antonio 2012, pet. ref'd).

[26] *See Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990) (op. on reh'g) (stating that "the appellate court should not conduct a de novo review of the record . . . ."); *Ex parte Gandara*, No. 08-10-00234-CR, 2011 WL 5995428, at *6 (Tex. App.—El Paso Nov. 30, 2011, no pet.)(mem. op., not designated for publication) ("In a habeas proceeding the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the court may accept some, all, or none of a witness's testimony.").

[27] *Ex parte Hunt*, 138 S.W.3d 503, 505 (Tex. App.—Fort Worth 2004, pet. ref'd) (citing *Montgomery v. State*, 810 S.W.2d at 380).

[28] *Montgomery*, at 391.

17.15 should be considered.[29]  "In a habeas case, the applicant bears the burdens of proving facts that would entitle him to relief and ensuring that a sufficient record is presented to show error requiring reversal."[30] Consequently, it is the appellant's burden to show that the bail set by the trial court is excessive.[31]

**A. This Court and the courts of this state have never recognized a "per se unreasonable" amount of bail and the burden of proof remains squarely on Appellant**

"The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand for trial and submit to sentence if convicted."[32] Excessive bail is prohibited by both the federal and state constitutions.[33] Like most other states, Texas has enacted a statutory framework that provides for pretrial bail in most cases to avoid the historical abuse of the bail system:[34]

1. The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.
2. The power to require bail is not to be so used as to make it an instrument of oppression.

---

[29] TEX. CODE CRIM. PROC. art 17.15; *Ludwig v. State*, 812 S.W.2d 323, 324 (Tex. Crim. App. 1991).

[30] *Ex parte Dixon*, No. 07-14-00433-CR, 2015 WL 1040927 (Tex. App.—Amarillo Mar. 6, 2015, pet. granted) (mem. op., not designated for publication) (citing *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993).

[31] *Ex parte Rubac*, 611 S.W.2d at 849; *Ex parte Baldivia*, 727 S.W.2d 337, 344 (Tex. App.—Amarillo 1987, no pet.).

[32] *In re Durst*, 148 S.W.3d 496, 498 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951)).

[33] U.S. CONST. amends VIII, XIV; TEX. CONST. art. I, §§ 11, 13; TEX. CODE CRIM. PROC. art. 17.15.

[34] *See Ex parte Benefield*, 403 S.W.3d 240, 241-43 (Tex. Crim. App. 2013) (Cochran, J., concurring) (noting that pretrial bail guidelines were enacted in response to some judges intentionally setting bail at an amount that detainees could not meet, employing an unconstitutional form of pretrial detention).

8

3. The nature of the offense and the circumstances under which it was committed are to be considered.
4. The ability to make bail is to be regarded, and proof may be taken upon this point.
5. The future safety of a victim of the alleged offense and the community shall be considered.[35]

This Court also gives consideration to the following common law factors: (1) the nature of the offense and length of sentence the defendant faces if convicted; (2) the defendant's ties to the community; (3) length of residency; (4) employment history; (5) prior criminal record; (6) the existence of other bonds against the defendant and his compliance with conditions of those bonds; and (7) aggravating factors involved in the alleged offense.[36]

Appellant argues that his bail "gives rise to an inference," or, alternatively, "leads to a presumption," that bail was set excessively high.[37] But no such presumption or "per se" rule exists in Texas. The court of appeals did not depart from the accepted and usual course of judicial proceedings when, instead of presuming error as Appellant advocates for, it engaged in the requisite analysis supplied by the Texas Legislature and this Court. Taking it one step further, Appellant argues that the bail amount in this case "leads to a presumption that bail was set excessively high, in itself discharging Dixon's burden of demonstrating his entitlement

---

[35] TEX. CODE CRIM. PROC. art. 17.15.
[36] *Ex parte Rubac*, 611 S.W.2d at 849-50.
[37] (App.'s Br. at 12).

to a reduction."[38] Appellant argues for an unprecedented burden shift that is unsupported by Texas law.[39]

In *Ex parte Brown*, the appellant made a similar argument, alleging he was subject to a "per se" unreasonable amount of bail because similarly set bail amounts had been lowered in other cases.[40] Rejecting the argument, the Dallas Court of Appeals reasoned that "in most of those cases, there was evidence regarding each of the factors we must consider."[41] The Dallas Court of Appeals then measured each of the facts in Brown's case against the relevant criteria before affirming the trial court's order.[42] Even in *In re Durst*, with the highest reported bail ever set by a trial court in Texas at $3 billion, the court of appeals made no mention of any per se or presumptive abuse of discretion.[43] Without authority in support of Appellant's position, it goes without saying that the court of appeals did not violate any per se or presumptive rule in affirming the trial court's order.

---

[38] (App.'s Br. at 12).

[39] In fact, a nationwide case law search leads to only two out-of-state cases referencing a per se or presumptive abuse in the bail setting context: *In re Scott*, 56 N.W. 1009 (Neb. 1983) (holding that the question is whether the bail was per se unreasonable and disproportionate to the crime charged); and *Abbott v. Colombus*, 289 N.E.2d 589 (Comm. Pl. 1972) (holding that the bond set in the case was per se unreasonable).

[40] *Ex parte Brown*, No. 05-00-00655-CR, 2000 WL 964673, *1 (Tex. App.—Dallas, Jul. 13, 2000, no pet.) (not designated for publication) (affirming a $1 million bail).

[41] *Id.*

[42] *Id.* At *1,2.

[43] *In re Durst*, 148 S.W.3d 496.

**B. The court of appeals properly measured the trial court's ruling against the article 17.15 factors when it concluded that Appellant had not met his burden**

The court of appeals was not unprecedented in its denial of relief based upon the "meager" evidence presented by Appellant the trial court level from a biased source.[44] Regarding the evidence presented by Appellant, the court of appeals noted the following: the current status of his medical license has not been shown; he owns a mineral interest; other than that his spa is leased its assets are not known, nor are any details regarding his medical practice; his family is currently paying his contractual alimony and child support expenses; he has no equity in his home worth $495,000; his truck, Porsche, and stocks in Apple were sold to help fund trial expenses; and that while Appellant personally lacked the assets to pay the bond, the family could afford a $100,000 bond.[45]

Based on the information before it (or lack thereof) the trial court concluded that the amount of bail was proper because Appellant failed to prove by a preponderance of the evidence that the $10,000,000 bail was excessive. The court of

---

[44] *Dixon*, at *5; *Priel v. State*, No. 07-09-0349-CR, 2010 WL 445287, at *3 (Tex. App.—Amarillo 2010, no pet.) (not designated for publication) (holding that the appellant did not carry his burden of proof when the evidence for the most part "consisted of oral generalities by individuals related or soon to be related to appellant."); *Cooley v. State*, 232 S.W.3d 228, 236-37 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding that due to a defense witness's failure to testify in detail about bank accounts, retirement accounts, stocks, and personal property held by the defendant, the trial court could have reasonably concluded that the testimony regarding the defendant's financial circumstances was "inconclusive."); *see also Ex parte Chavfull*, 945 S.W.2d 183, 186-87 (Tex. App.—San Antonio 1997, no pet.) (declining to reduce bail where the defendant's sole witness was his mother, who testified that the defendant did not have any money, and that she could perhaps raise $1,000).

[45] *Dixon*, at *2, 5.

appeals subsequently concluded that the evidence offered at the writ hearing was inconclusive, bringing the decision to continue bail at $10 million within the zone of reasonable disagreement.[46] Contrary to Appellant's assertion, the court of appeals ultimate holding was reached only after a review of the relevant criteria compared with the facts before the trial court.

*i. Bail was strategically set to give a reasonable assurance that Appellant—given his assets—will appear for retrial*

The purpose of assigning a money bail to a case is to "give a reasonable assurance that the undertaking will be complied with"—e.g., that an accused will have a significant enough investment that he will appear for his trial.[47] In most cases, this requires a court to consider an accused's assets when setting bail—what amount would require reappearance for one might be inconsequential to another.[48] Within this factor, courts often consider the flight risk a particular accused poses.

To this point, Appellant argues that he does not pose a significant flight risk because he went to Dallas after initially being questioned by law enforcement and promptly returned to Amarillo.[49] Those facts are not disputed. The weight they carry, however, are. The return trip occurred prior to his arrest (probable cause) and trial (the State believing it had proof beyond a reasonable doubt of Appellant's guilt).

---

[46] *Ex parte Castillo-Lorente*, 420 S.W.3d 884, 889 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Ex parte Scott*, 122 S.W.3d 866, 870 (Tex. App.—Fort Worth 2003, no pet.) (holding that the trial court could have properly concluded that the $100,000 bail was reasonable under the circumstances where the appellant offered very little evidence supporting the claimed inability to make bail).

[47] TEX. CODE CRIM. PROC. art. 17.15(1).

[48] TEX. CODE CRIM. PROC. 17.15(4).

[49] (App.'s Br. at 15).

Appellant has now witnessed a three-week trial where the details of the State's case have been revealed to him. Prior to his arrest, ignorance may have been bliss. And, the record is silent on how this procedural aspect of Appellant's case will affect his motive to stay or leave.[50]

The trial court and court of appeals also considered the civil lawsuit Appellant was facing as a result of this offense along with the strength of the State's case.[51] It is readily apparent from the court of appeal's opinion that it did not merely rubber stamp the trial court's decision when it affirmed bail at an amount high enough that Appellant, perhaps incentivized by his family's contribution, would be forced to return for his retrial.[52]

*ii. Bail is not being used as an instrument of oppression*

Appellant has failed to show that the trial court continued bail in the amount set for the sole purpose of keeping him in jail pending trial. Bail becomes oppressive when it is "based on the 'assumption that [the accused cannot] afford bail in that amount and for the express purpose of forcing [the accused] to remain incarcerated pending [trial].'"[53] Here, the assumption should be that a high bail amount is necessary to operate as a sufficient incentive to return for trial—not that it is prohibitively

---

[50] Appellant also argues that the record reflects that he has traveled internationally only one time. (App.'s Br. at 14-15). At trial, however, Appellant himself testified to several trips made in the year before his arrest, including vacations in Bermuda, Jamaica, New York, and South Carolina. (*See* 6 TR pp. 159-60, 167-68; 13 TR pp. 67, 130-31, 144-45, 149).

[51] (2 RR pp. 30, 34); *Dixon*, at *2.

[52] (Tex. App.—San Antonio 2000, no pet.); *Ex parte Arredondo*, No. 04-00-00306-CR, 2000 WL 33128681 *2 (Tex. App.—San Antonio, Dec. 6, 2000, no pet.) (not designated for publication).

[53] *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.).

13

high—with the burden on Appellant to prove otherwise. Based on that assumption, along with the dearth of evidence to the contrary, the court of appeals did not err when it affirmed the trial court's order.

*iii. The nature and circumstances of the offense were well known to the habeas judge, who presided over Appellant's trial and concluded that a high bail amount is necessary*

It is said that the nature and circumstances of the offense is among the most important considerations when considering bail.[54] The "nature" of the case, as used in an article 17.15 analysis, includes the seriousness of the offense and the potential penalty it carries.[55] This is the primary factor to be considered.[56] Capital murder—the gravest offense considered by the Texas penal code—is punishable by life in prison without parole or death.[57] The greater the potential penalty upon conviction, the lesser the incentive to return for trial.

The "circumstances" of a case "is best read as referring to the evidence that will be available on both guilty and penalty."[58] It is this consideration that distinguishes Appellant's case from all others in Texas: the habeas judge, who was the trial judge that presided over Appellant's first trial, was aware of every detail of both the state's and the defense's case-in-chief when it continued bail at $10 million. The court of appeals was not wrong to give great weight to this consideration, as the trial court is in the best position—having seen all of the evidence firsthand—to judge the likelihood

---

[54] *Rubac*, at 849.

[55] *Ex parte Fisher*, 492 S.W.2d 528, 529 (Tex. Crim. App. 1973).

[56] *Rubac*, at 849; *In re Durst*, at 500-04.

[57] TEX. PENAL CODE § 19.03(b).

[58] 41 TEX. PRAC. AND PROC. § 21:26 (3rd Ed.).

of Appellant's return for trial. And the setting of bail rests solely within the trial court's discretion.

To this point, Appellant points to the juror affidavits that were admitted at the writ hearing as evidence of the nature and circumstances of Appellant's case. But, it would be improper for this Court to supplant the trial court's assessment of the strength of the case against Appellant, when the trial court—and not the appellate court—is vested with the responsibility of determining the facts and making credibility determinations.[59] Second, the affidavits themselves conflict in their perception of the mental processes of others.[60] The affidavit signed by Mr. Knight states "In fact, on our final vote, as many as *five* other jurors were willing to vote not guilty" whereas the affidavit signed by Mrs. Fuhrmann states "In fact, on our final vote, *four* of us were not going to change our votes from not guilty, on all charges."[61] This conflict shows the subjective and unreliable nature of opining on the mental processes of another.

Instead, this Court is bound to defer to the trial court's determination of the matter.[62] The conflicting affidavits—much like Mary Dixon's testimony—are inconclusive at best. Even if this Court were to accept Mrs. Fuhrmann's count of eight to four, or Mr. Knight's count of seven to five, there still remains a majority of

---

[59] *Esquivel v. State*, 922 S.W.2d 601, 604 (Tex. App.—San Antonio 1996, no pet.).
[60] (*See* App.'s Ex. 12, 13).
[61] (App.'s Ex. 12, 13) (emphasis added).
[62] *Esquivel*, 922 S.W.2d at 604.

15

jurors voting guilty, and the evidence weighs in the State's favor.[63] Third, the Rules of Evidence have long barred juror testimony except in limited circumstances for good reason:

> Speculation over the collective attitude of jurors is no substitute for policy considerations clearly manifested by legislative direction and judicial reaction and construction in matters of personal liberty and freedom from restraint except upon good cause relating to the valid societal interest in securing the presence of the accused.[64]

While the juror affidavits were technically admissible in the writ hearing, courts have consistently declined to consider juror testimony in the face of motions for new trial and other proceedings. Policy reasons abound, but the prevailing concern is protecting the sanctity of juror deliberations.[65] As the court of appeals pointed out "determinations of the weight to be given particular testimony and of its bearing on the factors for setting bail were determinations to be made by the trial court. The court was not required to assign to . . . the hearsay statements by two jurors the weight Dixon attributes to those items of evidence."[66]

In a similar point, Appellant points to Shepard's testimony at trial alleging that he fabricated his confession to obtain a favorable plea bargain and avoid the death

---

[63] (*See* App.'s Ex. 12, 13).

[64] *Mayo v. State*, 611 S.W.2d 442, 444 (Tex. Crim. App. 1981) (declining to read into the implications of a "not true" finding on an enhancement when setting the amount of bail on appeal).

[65] *See Colyer v. State*, 428 S.W.3d 117, 123-24 (Tex. Crim. App. 2014) (noting that courts today "try to maintain the balance between the goal of a 'trial by jury free from bias or misconduct' and the need to prevent losing parties from trying the jury.") (quoting *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 367-68 (Tex. 2000)).

[66] *Dixon*, at *5.

penalty.[67] Here again the court of appeals was correct to defer to the trial court's assessment of the witness testimony at trial, and where both sides painted Shepard as a "con-man" and a liar.[68] Last, by indicting Appellant with capital murder for remuneration, the State has essentially alleged that Appellant used money to reach a desired end.[69] This critical fact, when considering what amount of money is sufficient to require Appellant's appearance for trial, should not go unnoticed.

*iv. Appellant's actual ability to make bail remains unknown*

The ability or inability of the accused to make bail is not determinative. Instead, it is merely one factor in the analysis.[70] While an accused's family is not required to help make bail, it is appropriate for courts to consider the family's ability to assist the

---

[67] (App.'s Br. at 5).

[68] (*See* 8 TR pp. 144, 150, 160, 162, 176-77, 201-02, 205, 227, 230, 237-38; 9 TR pp. 11, 14, 19-20; 10 TR pp. 65, 70, 145-47; 15 TR pp. 88-94) (highlighting each time Shepard admitting to lying, or the State *or* Appellant presented proof that Shepard had lied).

[69] The State alleges that Appellant paid Shepard three silver bars, valued at approximately nine thousand dollars, for the commission of the offense. At trial, Appellant claimed the money was for a business. Both sides agree that the money was given to Shepard without Appellant's wife knowing about it. So in either case, Appellant had nine thousand dollars he was able to give to Shepard while keeping it "off the books." It is not every defendant that can make a nine thousand dollar transaction without detection. It also illustrates a greater point about Appellant: the State has alleged that he orchestrated a murder from a city two hours away from where the murder ultimately occurred, and where Richelle Shetina still resides. If that is true, bond conditions such as GPS monitoring and surrendering his passport do nothing to protect the future safety of the victim and the community.

[70] *Ex parte Branch*, 553 S.W.2d 380, 382 (Tex. Crim. App. 1977); *Ex parte Hunt*, 138 S.W.3d 503, 506 (Tex. App.—Fort Worth 2004, pet. ref'd) (noting that if the ability to make bail was controlling, it would eliminate the trial court's role and an accused would be able to determine what his bail should be).

accused.[71] Indeed, at least one court has recognized that a family's financial contributions can help assure the accused's appearance.[72]

The evidence supporting Appellant's supposed inability to make bail is inconclusive. Both the bail bondsman and Mary Dixon testified to conclusions and generalities. "Further, Dixon's evidence cannot be seen as a serious effort to present his, or his family's financial condition."[73] Appellant accuses the State of forcing him to choose between his right to representation and right to reasonable bail. Appellant misses the argument. Instead, it is simply worth noting that the bail bondsman testified that a $1 million bond would be required for a bondsman to cover the bail. Appellant's trial cost over $1 million. This indicates that Appellant and his family did have the liquid assets to post bond, but for any number of reasons chose instead to fund a trial with three attorneys, investigators, an expert witness, and now a briefing attorney. Without proof that the trial fees depleted the family's assets, the trial court and court of appeals were left only with the impression that Appellant at least had access to $1 million prior to trial—something most people do not. This is not a comment on Appellant's rights to both reasonable bail and effective counsel, but only to point out that while specifics remain unknown, there is evidence to show he has access to great amounts of expendable wealth.

---

[71] *Ex parte Tata*, 358 S.W.3d 392, 401 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).
[72] *Ex parte Arredondo*, 2000 WL 33128681, *2.
[73] *Dixon*, at 11.

*v. The future safety of Richelle Shetina remains paramount*

"Sinister." "Creepy." "Sick." Three adjectives Appellant agreed described his behavior toward Richelle and Dr. Sonnier at trial.[74] While Appellant tried to deny that he was obsessed with Richelle, his actions in sending Shepard to conduct surveillance on Richelle and Dr. Sonnier—to learn their routines over the course of several months—say otherwise.[75] Evidence at trial revealed that Appellant was indeed obsessed—fixated—on Richelle and her relationship with Dr. Sonnier. The entire theory of the State's case was that Appellant was willing to kill for Richelle. Unlike the multitude of cases cited by Appellant, the murder in this case was not one of sudden passion or random violence—this was a premeditated and well-orchestrated plan that played out over months. The evidence produced at trial shows a plotted and planned power-play that the trial court had no reason to believe would not occur again. The future safety of Richelle weighs heavily against a low bail amount for Appellant.[76]

Appellant argues that he was not personally involved in the killing of the specific target, implying that the future safety of persons involved in the offense or

---

[74] (13 TR pp. 107, 120).

[75] (*See, e.g.*, 2 TR pp. 105-06) (discussing "Plan A").

[76] Whether the safety of a person other than the "named" victim in an indictment may be considered is unresolved. In *Ludwig v. State*, this Court opined in dicta that it is the future safety of the named victim alone that may be considered, but declined to resolve the issue. *Ludwig v. State*, 812 S.W.2d 323, 325 (Tex. Crim. App. 1991) (en banc). Lower courts, however, have included "close relatives" of the victim in determining the future safety of constituents. The State would argue that this is the only result that makes sense: in a murder prosecution, if only the named victim is to be considered, the "future safety" factor in the analysis would be rendered moot (as the victim will always be deceased) thereby prohibiting courts from considering the future safety of citizens from some of the most violent offenders.

19

the community weighs in his favor.[77] The veracity of that assertion could be disputed, but regardless, Appellant's involvement goes beyond that of the defendant in a case where that argument proved persuasive. In *Ex parte Henson*, the defendant was an indicted co-defendant in a murder, but was not accused of pulling the trigger.[78] Evidence produced at the writ hearing showed that Henson did not actually plan or intend for the crime to be committed.[79] To the contrary, the evidence adduced at trial showed Appellant's involvement at every step of the plan, including in the minutes before and immediately after the murder.[80] And the trial judge, as the sole finder of facts and determiner of credibility in a writ hearing, knew each of those facts when he continued bail at $10 million. Appellant's victim was a very specific target, but the crime shows an aptitude for vengeance that should not be overlooked.

*vi. Appellant has no ties to Lubbock County*

In reviewing an accused's ties to a community, courts consider the accused's ties to the *county of prosecution*.[81] Otherwise, an accused would arguably always have ties to *some* community, *somewhere*. Consequently, Appellant's account of familial and community ties to Spearman and Amarillo are meaningless. Appellant did not offer a single tie or association with Lubbock County at the writ hearing.[82] Based on the

---

[77] (App.'s Br. at 14).
[78] 131 S.W.3d 645, 651 (Tex. App.—Texarkana 2004, no pet.).
[79] *Id.*
[80] (9 TR 83-84).
[81] *See Ex parte Hunt*, 138 S.W.3d at 506-06 (citing *Ex parte Brown*, 959 S.W.3d 369, 373 (Tex. App.—Fort Worth 1998, no pet.).
[82] "Appellant has no demonstrated ties to Lubbock County." *Dixon*, at *5.

absence of evidence tying Appellant to the Lubbock community, the habeas court could have easily concluded that community ties were insufficient to give a reasonable assurance of Appellant's appearance at trial.[83]

**II. THE COURT OF APPEALS GAVE APPROPRIATE CONSIDERATION TO PRECEDENT WHILE RECOGNIZING THAT BAIL CASES ARE GENERALLY FACT SPECIFIC AND SUCCINCT IN THEIR ANALYSES**

Several courts have noted that prior decisions are of little value in reviewing a bail setting, in part because the decisions are often brief and without discussion, and because matters of bail are fact-specific, making it difficult to draw generalizations.[84] The *Beard* court considered prior decisions, however, noting the factual and legal distinctions, many of which Appellant points out as well.[85] But in every case, certain factors weigh more heavily than others, and a reduction in bail cannot be supported by pointing to other cases in which the same was done without a relevant nexus of similar facts.[86] Instead, a fact-specific analysis should be done in each case giving adequate weight to the unique, and often contravening, factors of a particular case.

---

[83] *See Maldonado v. State*, 999 S.W.2d 91, 97 (Tex. App.--Houston [14th Dist.] 1999, no pet.) (considering a lack of relatives, employment, real property in the county and that the defendant was from and lived outside of the county in denying a bail reduction).

[84] *See, e.g., Ex parte Beard*, 92 S.W.3d 566, 571 (Tex. App.—Austin 2002, pet. ref'd). The fact-specific nature of the inquiry is what makes relying upon such a scant record so difficult.

[85] *Id.*

[86] *Ex parte Murray*, No. 02-13-00151-CR, 2013 WL 5425312, at *3 (Tex. App.—Fort Worth, Sept. 26, 2013) (*not designated for publication*); *Ex parte Pemberton*, 577 S.W.2d 266, 267 (Tex. Crim. App. 1979) (noting that there is no "precise standard for reviewing bond settings on appeal.")). For this same reason, the ten indictments offered by Appellant at the writ hearing illustrating bail amounts in Lubbock County carry little weight. (2 RR pp. 12-13). As the State pointed out at the hearing, those cases carried entirely different sets of facts, including the most notable: that every single one of the

Appellant cites to five cases in particular where large bail amounts were reduced by courts of appeals, and in one case, by this Court. The first is *Ex parte Gonzales*, where the Fourth Court of Appeals noted that in the entirety of reported cases in Texas, the highest bail amount ever approved by a court of appeals is $1.5 million, and prior to that case the highest amount approved in even the most "egregious" of cases was $1 million.[87] Nonetheless, the court of appeals continued bail in the amount of $1.5 million, holding that the appellant did not carry his burden based on the "paucity of testimony."[88] To be sure, factors not present in Appellant's case existed in Gonzalez's case, such as a random act of violence, an extensive criminal history, and preliminary steps that indicate a tendency to flee (e.g., applying for an expedited passport).[89] But Appellant presents issues that *Gonzalez* did not, such as vast and undetermined resources that necessitate a higher bail amount.

Next, Appellant points to *Ex parte Estrada*, also decided by the Fourth Court of Appeals prior to their decision in *Gonzalez*.[90] There, a $1 million bail was reduced to $600,000 and the court engaged in a relatively lengthy factual analysis of the case.[91] It would be difficult to find facts more wildly distinguishable that Appellant's. Estrada was an eighteen year old that lived with his parents of relatively modest means, was

---

defendants had appointed attorneys, whereas Appellant has not one—but four—hired attorneys. (2 RR pp. 12-13). There is a clear disparity in resources between Appellant and the other ten indicted defendants, and any comparison in bail amounts would be misplaced.

[87] 383 S.W.3d 160, 164 (Tex. App.—San Antonio 2012, pet. ref'd).

[88] *Id.* at 165.

[89] *Id.* at 162-64.

[90] *Ex parte Estrada*, 398 S.W.3d 723 (Tex. App.—San Antonio 2008, no pet.).

[91] *Id.* at 727-28.

wholly financially dependent on his parents, and committed a murder in the course of a burglary of a habitation that went awry.[92]

Perhaps more similar are the facts laid out in *Ludwig v. State*, decided by this Court in 1991.[93] Appellant cites *Ludwig* for its quotable notation that at the time, "this Court had yet to condone a bail amount even approaching seven figures, even in a capital case."[94] Yet, important facts present in Appellant's case were not in *Ludwig*: the facts of the underlying crime were not developed at the habeas proceeding; as a licensed veterinarian, Ludwig was presumably wealthy, but his assets appeared to have been frozen in child custody and divorce proceedings;[95] and there is no indication of the familial wealth that Appellant has access to. Despite these distinguishing factors, the Seventh Court of Appeals opinion indicates that it is aware of the fact that Appellant's bail is the highest affirmed in Texas—signaling that the decision was made carefully and thoughtfully as opposed to arbitrarily and capriciously.

Last, Appellant points to two cases dealing with wealthy defendants and high bail amounts.[96] The first, *Ex parte Beard*, reversed a trial court's order setting bail at $8 million.[97] Beard was accused of murdering her husband to inherit his wealth.[98] In reducing her bail, the court considered that basic living expenses, gifts, and legal

---

[92] *Id.* at 725-26.
[93] 812 S.W.2d 323 (Tex. Crim. App. 1991) (en banc).
[94] *Id.* at 325.
[95] *Id.* at 324.
[96] (App.'s Br. pp. 16, 19, n. 2).
[97] 92 S.W.3d 566, 567 (Tex. App.—Austin 2002, no pet.).
[98] *Id.* at 568-69.

expenses consumed much of the assets received by Beard.[99] Of course, in *Beard*, the court of appeals had before it documents depicting the current status of the estate, the deceased's will, and evidence of real property transactions, making the trial court's credibility and factual determinations less significant. In Appellant's case, the court of appeals had no similar documentation to rely upon and affirmed—due in large part— to the applicable burdens of proof and stringent standard of review.[100] Based on those two points of analysis, *Beard* is not comparable. The second case Appellant points to is *In re Durst*—a bit of an (apparently continuing) anomaly.[101] It is difficult to argue that in that case that the three billion dollar bail was designed to do anything other than keep Durst in jail. Contrasting *Durst* with Appellant's case, both the trial court's order and the court of appeals opinion show a much more carefully constructed bail amount with consideration given to all relevant factors.

---

[99] *Id.* at 569-70.

[100] *Dixon*, at *6.

[101] (App.'s Br. p. 19, n. 2 (citing *In re Durst*, 148 S.W.3d 496).

**III. WHILE APPELLANT'S BAIL IS AMONG THE HIGHEST REPORTED IN TEXAS, IT IS NOT OUT OF LINE WITH SIMILAR CASES THROUGHOUT THE UNITED STATES**

The bail system is making headlines recently—admittedly, most of them negative.[102] From $1 million bail settings for 170 arrested in Waco to a $250,000 bail for a juvenile involved in the Baltimore riots, when taken at face value the system appears to have lost its compass. But the foundational premise of the bail system endures: bail should be sufficiently high to give reasonable assurance that the undertaking will be complied with. And money bail continues to be the single most successful way to ensure an accused shows up for trial.[103] Appellant's case is not one of an impoverished citizen forced to make a choice between pleading guilty or waiting in jail, unable to scrap together $1,000.[104] Nor is Appellant like Robert Durst, who can say "bye" to $250,000 and flee.[105] Instead, the amount was carefully calculated to ensure that Appellant (perhaps by the indebtedness to his family) will appear for trial, or otherwise risk losing—what is to them—a significant sum of money. Courts should

---

[102] Shaila Dewan, When Bail is Out of Defendant's Reach, Other Costs Mount, N.Y. Times, Jun. 10, 2015, http://www.nytimes.com/2015/06/11/us/when-bail-is-out-of-defendants-reach-other-costs-mount.html; Jim Dwyer, A life that frayed as bail reform withered, N.Y. Times, Jun. 9, 2015, http://www.nytimes.com/2015/06/10/nyregion/after-a-shocking-death-a-renewed-plea-for-bail-reform-in-new-york-state.html; Lisa Maria Garza, Mass arrests, revenge fears after deadly Texas biker gang shootout, Reuters, May 11, 2015, http://in.reuters.com/article/2015/05/18/usa-texas-shooting-idINKBN0O317U20150518; Michael Shwirtz and Michael Wanerip, Kalief Browder, held at Rikers Island for 3 years without trial, commits suicide, N.Y. TIMES, Jun. 8, 2015, http://www.nytimes.com/2015/06/09/nyregion/kalief-browder-held-at-rikers-island-for-3-years-without-trial-commits-suicide.html?_r=0.

[103] Dewan, *supra* note 88. (quoting Judge Steve White, president of the Alliance of California Judges, as saying "Bail probably is the single most reliable assurance that somebody will show up.").

[104] *Id.*

[105] Melissa Locker, Watch John Oliver Slam the Unfairness of the U.S. Bail System, TIME, Jun. 8, 2015,http://nymag.com/daily/intelligencer/2015/06/john-oliver-discusses-the-us-bail-system.html.

not simply defer to what an accused claims is a reasonable bail amount—if that were the case, an accused could essentially set their own bail and go on their way, vitiating the other concerns outlined by the legislature and undermining the purpose of the money bail system.

If affirmed, Appellant's bail will be the highest approved by this Court. An overview of high bail amounts approved by other states, however, reveals that it is not out of line with similar offenses and similarly situated defendants:

- Marion "Suge" Knight, charged with murder, $25 million bail;[106]

- Kim Freeman, charged with prostitution, $1 billion bail;[107]

- Christopher Williams, charged with attempted second-degree murder among other felony charges, $100 million bail;[108]

- Hun Saelee, charged with attempted murder, $10 million bail;[109]

- Alvin Watts and Jake England, charged with murder, $9 million bail each;[110]

---

[106] Michael Martinez and Stella Chan, 'Suge' Knight collapses after judge sets bail at $25 million, CNN, Mar. 20, 2015, http://www.cnn.com/2015/03/20/entertainment/suge-knight-hit-and-run-murder-case-bail/. A trial court later lowered Knight's bond after dismissing two counts of the indictment.

[107] Shawn Hill, Judge set bond for alleged prostitute at $1 billion, AP, Jun. 24, 2005, http://archive.wtsp.com/news/article/15280/8/Judge-set-bond-for-alleged-prostitute-at-1-billion.

[108] Stephanie Lippert, 100 Million Dollar Bond Set for Accused Memphis Carjacker, EXAMINER.COM, Dec. 14, 2010, http://www.examiner.com/article/100-million-dollar-bond-set-for-accused-memphis-carjacker.

[109] Couple Pleads Not Guilty in Halloween Party Shooting at SF Fort Mason, CBS LOCAL, Nov. 5, 2012, http://sanfrancisco.cbslocal.com/2012/11/05/couple-pleads-not-guilty-in-halloween-party-shooting-at-sf-fort-mason/.

[110] Manny Fernandez, 2 Tulsa Shooting Suspects Confess, Police Say, N.Y. TIMES, Apr. 9, 2012, http://www.nytimes.com/2012/04/10/us/tulsa-murder-suspects-have-bail-set-at-9-1-million.html.

- Michael Sorodsky, charged with sexual abuse, $33 million bail.[111]

Certainly each of the above cases come with its own set of particular circumstances that affected the specific bail amount that may or may not be present in Appellant's case. But to the extent the $10 million number is notable against the backdrop of previously approved bail amounts in Texas, a broader perspective shows that it is warranted in some instances. An appellant with vast and undetermined resources making a conclusory claim that he cannot afford bail is one of those instances. The discretion to set the bail amount rests in the solely with the trial court.

## CONCLUSION AND PRAYER

The State respectfully requests that the Court affirm the judgment of the Seventh Court of Appeals, which affirmed the trial court's order denying Appellant's application for writ of habeas corpus and motion for bond reduction.

Respectfully submitted,

*MATTHEW D. POWELL*
Criminal District Attorney
State Bar No. 00784782

By: /s/ Lauren Murphree
Lauren Murphree
Assistant Criminal District Attorney
Lubbock County, Texas
State Bar No. 24085059

---

[111] Oren Yaniv, Bogus cancer doctor charged with sexually molesting his sedated cancer patients, held on $33M bond, DAILY NEWS, Feb. 27, 2011,
http://www.nydailynews.com/news/crime/bogus-cancer-doctor-charged-sexually-molesting-sedated-cancer-patients-held-33m-bond-article-1.136742.

27

P.O. Box 10536
Lubbock, Texas 79408
(806)775-1133
FAX (806)775-7930
E-mail: LMurphree@lubbockcda.com
Attorney for the State

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing State's Brief on the Merits has been delivered to Aaron Clements, Attorney for Appellant, by e-mail delivery to aaron@hurleyguinn.com on June 18, 2015, and that a true copy was delivered to Lisa C. McMinn, State Prosecuting Attorney, by placing a copy in the United States Mail, addressed to her at P.O. Box 13046, Capitol Station, Austin, Texas 78711 on December 16, 2014.

*MATTHEW D. POWELL*
Criminal District Attorney
State Bar No. 00784782


By: /s/ Lauren Murphree
Lauren Murphree

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4(i)(3), I further certify that, relying on the word count of the computer program used to prepare the foregoing State's Response, this document contains 9,738 words, inclusive of all portions required by TEX. R. APP. P. 9.4(i)(1) to be included in calculation of length of the document.

*MATTHEW D. POWELL*
Criminal District Attorney
State Bar No. 00784782


By: /s/ Lauren Murphree
Lauren Murphree